Morning. This would be I think I'm pronouncing this right. Kimera Holding v. Kennedy Financial. Morning, counsel. Morning. Morning. Mr. Hilliard, whenever you're ready, sir. I'm ready, Your Honor. Good morning. May it please the court. May I reserve three minutes for rebuttal, please? The parties here agree on one thing. When the loan commitment agreement was signed on November 1, 2017, one of the most material terms was missing. Schedule C. The identification of the real estate collateral. And it is difficult to imagine in a real estate lending contract a more material term than the identification of the collateral. I think that is undisputed. What the district court should have done at that point was to examine the entire record before it, which is contained in the appellate appendix. And I do wish to point out that with the exception of the document at the end of the appendix, which is simply the notice of motion for reconsideration, all of the other documents were part of the record before the district court rendered its decision in April of 2023. So what the district court should have done was look at the entire record and determine if there were any genuine issues of material fact about whether the parties actually agreed on the collateral. The district court did not go there because it was convinced that there was no ambiguity at all in the terms of the contract. And to quote the district court's decision, I quote, there are no contractual terms addressing or limiting the types of properties to be selected. That formed the basis of the district court's conclusion that Quermara was free at any point to go back to Kennedy Funding and say, we'd like a loan at 55% LTV on this property instead of this property. And so the district court never actually looked at the entire record. Had it done so, we respectfully submit that there were abundant, at the very least, abundant issues of material fact on whether the parties actually reached an agreement. Did you argue that the parties didn't reach an agreement below? Yes, yes. We, in fact, the Council for Kennedy Funding below, made its own motion for summary judgment as I believe it was a cross motion. Any idea why Schedule C was left blank? I'm sorry, Your Honor. Any idea why Schedule C was left blank? I mean, that's, I mean, we're talking about the big enchilada here. We are, we are. And I would concede that the testimony was conflicting on that point. Quermara's principal testified that they went to Kennedy Funding and said, you propose the collateral. We'll go with it. Kennedy Funding's testimony, Kevin Wolfer, its principal, in his deposition, again, before the court, was that, you know, we talked about it and we had this entire list of properties in front of us and we ultimately decided to select nine of them. Which, by the way, six out of the nine ended up being the same as what Quermara had proposed in its own list. But to answer your question, Your Honor, there is some dispute, I believe, in the record. And so I'm not standing here contending, and I didn't take a cross notice of appeal, I'm not standing here contending that summary judgment should have been granted in Kennedy Funding's favor. I am saying that there were certainly substantial issues of material fact. Now, on whether an agreement was reached, and if so, whether there were disputed facts about who performed and who, if at all, breached. And I think those are all issues that could and should have gone to a jury to determine. If I may briefly summarize what I think those issues were in the record that the district court never reached. Number one, Kennedy Funding's principal, Kevin Wolfer, testified in his deposition that he received a list of nine properties from Quermara shortly after November 1st. And those were the properties, we all know this, those were the properties that were actually sent to CDRE Chile for appraisal. Now, Quermara received an invoice on December 7, 2017, a couple of months later, which specifically listed these nine properties Kevin Wolfer testified about. That's in the appendix at 569. Now, there is nothing in the record to indicate that Quermara objected to the lenders moving forward with an appraisal of those nine properties. In other words, the facts of record before the district court would not permit a jury to conclude, would permit a jury to conclude, excuse me, that the parties at that point actually agreed on what should have been attached as Exhibit C to the contract. Because Quermara got the December 7, 2017 letter with an invoice for the appraisal fee for $85,000. And then it paid the appraisal fee shortly thereafter, along with an additional $300,000, the second part of the commitment fee. So, my argument to a jury would be, if Quermara had a problem with those nine properties, why did it pay $385,000 to go forward with the deal at that point? Why wasn't it writing back to Kennedy Funding to say, wait a minute, these aren't the properties. These are the properties. What are you doing? We're not going to pay a dime at this point. That didn't happen. Going back to Schedule C, it's possible that there was a deliberate decision made by both parties to leave the meaning of the collateral undetermined for subsequent negotiation. It is quite possible, Your Honor. I do agree that that aspect of the record is murky. But I return respectfully to what I just indicated, which was the record evidence would certainly permit a jury to conclude that at some point later on, they did reach agreement. And they reached agreement no later than December 7, 2017, when Quermara gets an invoice with the nine properties that are going to go to CBRE and then pays $385,000. Now, what happens after that? The next month, in January, CBRE presents the appraisals to Kennedy Funding. The very next day, Kennedy Funding makes its loan offer $55,000.  On January 23. They had three days, didn't say business days, three days to get back, but they didn't get back until January 29, the following Monday. Correct. So why wasn't the response of Kennedy that, hey, there is no agreement at this point? Kennedy did later say that you haven't complied with the terms of the loan commitment. But candidly, Your Honor, they wanted to go forward with the loan. Kennedy, and I think the record shows this, Kennedy wanted to go forward with... In the mezzanine lending world, that's a big commitment. It is. It is. The record that Kennedy received. I'm sorry, Your Honor. I'm sorry. In the mezzanine lending world, that was a nice piece of change that they received for the commitment fee. Yes, it was. Yes, it was. It was less than the total commitment fee that would have been due at closing. The commitment actually provided that close to $2.5 million was supposed to be paid up front, but they negotiated that to be done in pieces so that only $500,000 was paid. But the record does show that Kennedy Funding, even after Quermara objected to the way in which CBRE did the appraisals, Kennedy Funding tried to work with Quermara after that. And then he gave them three options. Interestingly, the first, the January 23 offer, I think, was 32-6, something like that, of a loan, 55% of $59 million. And then, but when you came back later, it was, I'll give you three options to proceed, try to get this done, and one of them was a $35 million loan. Why the uptick from 32-6 to 35? I believe, Your Honor, it had to do with the types of properties that Kennedy Funding was talking about. In other words, the nine properties that were appraised were a mix of unimproved land and improved land. The one property that was not on Quermara's list, that was on Kennedy Funding's list, was, and I'm going to destroy the pronunciation, so I think it was Arequipa for short. But that property, Kennedy Funding believed, was the best income-producing property, was the only true completed project in Peru. And therefore, Kennedy Funding believed that this was a great risk to take on because it was already completed, it was substantially income-producing, therefore, they were willing to loan more on that. Quermara took that property out of the equation, as we know, and they took it out of the equation because it had already had an enormous amount of debt. I believe it was about $12 million sitting on that property, and I have the actual page, that was the appendix at 557. That Aceros Arequipa property had $12 million in debt on it, and so ultimately, Quermara said to Kennedy Funding, you know, we really would like to take that property out of the equation because based on what you're lending us with this debt, we're just not going to make any money on this. We want to make money on this. So they tried to take it out. I think that was the, I could be wrong, Your Honor, but I think that was the reason why that other option was presented to Quermara. I'm sorry. I mean, is your ultimate argument that you came forward on February 6th with a counter-offer that Quermara declined on the 9th because the parties never modified the original loan agreement? Yes. We made a presentation of a revised loan offer at a lower LTV, and for a variety of reasons, I think Quermara did not accept it, and the parties never did any deal. I think we called it a counter-offer. I really think it is a proposal to amend the agreement, to change the agreement's terms. And again, as I have been repeatedly saying, I apologize, I think those were all genuine issues of material fact that should have been allowed to go to a fact finder. Thank you. Thank you. Thank you. I'll try again. Good morning, Your Honors. I'm Masoud for the Plaintiff Appellee Quermara. And I just wanted to start out by saying one thing, Your Honors, is with respect to the arguments that we've been hearing here on the appeal by Kennedy Funding, they were never raised on the original motions. They were raised for the first time on a motion for reconsideration, which was denied on the basis of the fact that these arguments were never raised in the initial motions before the district court. But the court considered them. One other thing is that with respect to Schedule C, the quote-unquote ambiguous Schedule C, again, that argument was never raised before in the district court on the original motions. Raised for the first time on the motion for reconsideration. So what happened? What was the deal as you understood it with respect to a blank piece of paper supposedly to contain what the collateral was? Was it still being negotiated what the collateral was and nobody just talked about it? What happened, Your Honor, is that Quermara provided a list of well over 25 commercial properties and asked Kennedy Funding— Prior to the loan commitment letter? On the day of the loan commitment. This is the November 1 list. Right. When they sat down to sign and they paid first the $15,000 in order to look at the loan commitment, then they provided the exhibit and asked Kennedy Funding choose what properties you want to be appraised. Because the maximum funding amount is $50 million, the minimum is $3 million, and it's based on a formula. So they gave them the list of— So they make the January 23 offer. They said, we look at these nine properties and they're worth $59 million, 55% of that is $32 million, $32.6. So that's what we're offering. You had three days and you didn't respond until six days later. So do we even have an agreement anymore? Well, Your Honor, first of all, they never said too bad your three days are over. I get it, but I mean— And that argument was never also based— They never also said that—or did they say that we are waiving the fact that you didn't respond within three days? What they said was, you can pay us an additional $500,000 to get an extension of time to get your own appraiser to come in and do an appraisal of these properties as per the contract or take out some of the properties. And that's in an email from Kevin Wolfer to Juan Carlos, and it's cited in the record and in our brief. Our people, Camaro, went back and says, okay, fine, take out these four properties and give us a loan based on your appraisal of these five properties. And this is where— That's when they dropped the 55% to 50%. They dropped the 55% to 50%. And as the court below found, the district court, Judge Cox, is that it was always 55%. It didn't matter what type of property, whether it was developed or whether it was undeveloped land. Because remember, it was Kennedy funding that chose the properties to be— Let me ask you a question. So you say to us, we entered the contract on November 1st. We had the list of about 20 properties on November 1st. And we said to Camaro, we said to Kennedy Funding, you choose the properties.  If Kennedy Funding had the ability to choose the properties, why didn't they comply on the 27th when they gave an offer, chose it on properties, and provided a 55% offer? Why wasn't that compliance on that date? And then the failure to respond within three days, a rejection. What I understand, and that was through the depositions and through the process, is that they started to speak to each other via phone. And what happened is that the two principals, Enrique Del Solar and Juan Carlos, needed to look at the appraisals and get in touch with their own appraiser because they had an option to get their own appraiser if they did not agree with the appraisals. That's when they spoke to them. And that's when Kennedy Funding said, okay, either accept or take out some of the properties. And I understand your position on that, but when we have a contract in front of us that says you can't amend, alter, do anything to this contract that's not in writing, why should we consider any of that? Well, first of all, Your Honor, because the argument, and it's a very good argument, should have been raised before, but it wasn't. They didn't argue that on the motions for some of the charges. That means it's forfeited, but we can determine to still analyze that if we determine it meets the standard for analyzing a forfeited argument. So if we consider the argument, what's your response to my question? It's easy, Your Honor. Kennedy Funding came back and said, okay, under the terms of the agreement, remove some properties and we're going to give you 55% of the as-is approval. As-is appraisal. And that's exactly what Camara did. And remind me, the remove some properties, was that in an email or was that over a phone call? That was in an email. So is your position that email then is a modification of the terms of the agreement? Or an extension of the term of the agreement to agree or not accept or not accept. Because there was no modification as to, let's change what the percentage is going to be, what the interest rate is, or so forth. I actually meant a modification of, number one, the date, but then also of who could decide which of the November 1st properties. And Kennedy Funding told Camara, you choose what properties you want to remove. Tell us which properties you want to remove. And when they did so, then Kennedy Funding came back and says, okay, we're only going to give you 50%, not 55% of the as-is. Let me ask you another question. So it seems to me as I understand New Jersey law, New Jersey really allows an examination of extrinsic evidence to determine the meaning of a contract. It's not like some other states that say, all right, we look at the plain meaning of a contract. It doesn't matter what any extrinsic evidence says. New Jersey says, no, we try to figure out the intent. And that allows us to look at a significant amount of extrinsic evidence. You and I have been talking for a few minutes back and forth about extrinsic evidence and what it means. I'm struggling to understand if we get to look at extrinsic evidence, and we're talking back and forth about phone calls and emails that go back and forth, how there's not a material dispute of fact here about when the, who got to choose the properties, when they had to choose the properties, whether or not the contract, whether or not the contract was modified. When we open up that door, how is there not a material dispute of fact? Well, we start with the first step. Argument never raised before the court. You can't bring it in on a motion for reconsideration or on appeal for the first time. Did the court, in denying the motion for reconsideration, did it address the issues brought up on the motion? On the original motion? No, on the motion for reconsideration. Did the court address the issues? No, it said that these are arguments being raised for the first time, improper. Therefore, I can't consider them. And that is the proper standard. You didn't raise it before the district court on the initial motions. And it wasn't one motion. It was both sides moved for summary judgment. They have an opportunity to raise those arguments either in opposition to Camara's motion for summary judgment or in support of their own motion for summary judgment. But they were so sure of their argument that they came in and they argued that A, the agreement was unambiguous, straightforward, make a decision based on what the agreement says. Two, is that the offer by Kennedy Funding for Camara to remove some of the properties and then a loan will be given on it. Then they came in on the reply papers. They say, oh, that was a counteroffer. But it wasn't a counteroffer. All that happened here is that Kennedy Funding took the position that this was a valid, enforceable, unambiguous agreement at the time it took the $600,000 from Camara. Kennedy Funding... On the 9th of February when they offered the three options, including a loan of $35 million, which was more than $2.4 million more than they had initially offered on January 23, why wasn't that accepted? Excuse me? Why wasn't that accepted? Because some of the properties that they were valuing, they applied discounts of 70% to them. Some of them are like City Center and so forth. These are worth hundreds of millions of dollars. And they applied 70% discount and then figured an additional discount to sell all the properties. Two other options. Go with the five properties, I guess at 50%, or get another appraisal.  They did not say five properties at 50%. They said you can remove some of the properties. And that's what Camara did. Removed four properties. Between February 9 and February 15, you just did nothing and let the offer expire, right? That is not true. Well, did you respond between the 9th and the 15th? I don't have it in front of me, but I do believe so. In fact, if I may, February 12th, Camara funding, sorry. Did you accept any of the options? No, February 2nd. We're talking about February 9th. They made you, you could accept the revised loan offer in the amount of $35 million, secured by the collateral as agreed in the loan commitment. That's the nine properties, I take it. Exactly. To accept the revised loan offer in the amount of $23 million, secured only by the five properties requested by you, or three, elect to proceed with third-party appraisal if the collateral was agreed to in the loan commitment. I think, Your Honor, we're confusing the emails. February 2nd, 2018 is the email from Kennedy Funding, Kevin Roefer, where he said, as per our conversation, you can engage the services of a third-party appraiser, or you can remove properties. What I understand is Camara requested that Kennedy calculate a new loan using revised collateral on February 6th. Am I wrong? Not new collateral. On February 6th, they told them, based on the, we're removing four of the nine properties. Give us a loan based on that. And the value of that properties, 55% appraisal, would come out to be about... So the facts are, that you're stating, are diametrically opposed to the facts that your opposing counsel is stating. And so why doesn't that just cry for summary judgment? I'm not saying that they're diametrically opposed. I'm saying the facts are the facts, and the facts are established by documentary evidence. What was done on February 6th, then? On February 6th, February 6th is when Kennedy Funding asked for another half-million-dollar extension fee. February 2nd is when they said you can get an appraisal or remove properties. On February 9th, Camara came back and says, you know what? We're not going to pay you an additional half-million dollars. Remove these four properties. That was the option they were given. One of two options. They said remove those two properties. At which point, then Kennedy Funding came in and said, oh, we're only going to give you 50% of the value. So you're saying that Kennedy responding on February 9th by offering either the original loan or a loan equal to 50% of the February 6th properties, you're saying February 9th is a wrong date. It didn't happen on February 9th, despite what was said. I think we're getting confused as to which emails. Because there is a string of emails that begin on February 2nd. There's February 2nd, February 6th, February 9th, February 12th. What was February 6th, then? February 6th email is where Kennedy Funding came in and said, if you want an extension of time to get your own appraisal done, we want you to pay us $500,000. On February 9th is when Camara went back and said, no, we're not going to pay you an additional half million dollars, but we're taking you up on the second part of the proposal, which is remove the properties. And they said, we are removing these four properties. On February 9th? That's on February 9th. That's on February 9th. You're telling me there were two emails on February 9th? Excuse me? Are you telling me there were two emails on February 9th? There was an email sent on February 9th by Kennedy Funding that said, we're going to give you $23 million based on these five properties. And they're saying that they responded what they call, I think at that point, a counteroffer, but maybe it's something different, an amendment to the loan commitment. One, accept a revised loan offer in the amount of $35 million secured by the collaterals agreed to in the loan commitment. Two, accept a revised loan offer in the amount of $23 million secured only by the five properties requested by you. Or three, elect to proceed with a third-party appraisal of the collaterals agreed to in the loan commitment. And that's in Appendix 551. Are you telling me that is not a February 9th email? There were two on February 9th, Your Honor. I'm asking, but is that one on February 9th? I don't have it in front of me, but if Your Honor says it is, I'm sure it was. Because the District Court held that the February 9th email was not a counteroffer. Because it, quote, could not reasonably be construed. There's no counteroffers under the terms of the original agreement. Under the terms of the original agreement, Camara is entitled to a loan equal to 55% of the designated collateral. In this particular case, by the end of the negotiation, by the end of the day, in February 2018, the designated collateral consisted of five properties. And that looks to me like it's a letter from Juan Carlos Godova on February, email on February 6th, to remove the five properties as collateral. Correct. On February 6th. That's what I had said before. That was in response to Kennedy Funding's proposal on February 2nd, that they can remove some of the properties. Any questions? A lot of them. The question is,  absent the possibility of a forfeiture of arguments in the trial court, is there enough for a court to say that there was an unambiguous contract such that there were no material facts at issue such that summary judgment is appropriate? In this particular case, Your Honor, with all due respect, I do believe the district court could say that it had the record in front of it. One of the problems, however, is that we withdrew some of the claims in light of the fact that if summary judgment was granted on this cause of action, we agreed to withdraw the other claims that were against the individuals as well as Kennedy Funding, including fraudulent acts and so forth. If there is a reversal and it goes back to the district court, that would have to revive those claims as well, Your Honor. Thank you. Mr. Hill, why don't you start with the waiver arguments? I believe the counsel's argument is that because we took the position in the district court that there were no disputed issues of fact and that the contract was clear that we should be entitled to summary judgment. Because we made that argument, we forfeited the argument that there were issues of fact warranting a trial. Do you make any alternate arguments assuming that the court disagreed with you on whether there was an unambiguous contract? I don't. Honestly, Your Honor, I'm not sure. I didn't go back and look at the brief that was actually submitted to the district court. I'm not sure. I wasn't representing Kennedy Funding in the district court. I'm not sure if that specific argument was made, but I do think that when competing cross motions for summary judgment are made, one side arguing we win because there are no disputed issues of fact and the other side arguing the same thing, that doesn't mean that the district court is compelled to pick or choose one and rule in one side or another's favor. I mean, I've certainly had cross motions for summary judgment I've dealt with for many, many years. And it's still the obligation of the district court to look at both sides' arguments and, if they're both wrong, ultimately conclude, no, no, no, there are issues of fact here. I can't agree with either side and I'm going to let this go to the fact finder. Do you agree with your friend on the other side that if we determine that there are material disputes of fact and reverse, we need to do something to revive the claims that they released, dismissed, I don't remember exactly what they did with the other claims they had. That came up at oral argument, Your Honor, and Mr. Massoud indicated actually, I believe it was after oral argument, right around the time of oral argument, I apologize, and he agreed to dismiss those claims based on the ruling on the breach of contract claim. My view is those claims would have to be revived in the district court. I can't make any good faith argument that his client would now be hamstrung by only having a breach of contract claim if I argue successfully that the district court should not have granted summary judgment. I just want to make sure that was agreed to. I think that's clear. I think I would be disingenuous if I suggested otherwise. With respect to that double February 9th email that was being discussed earlier, my understanding is that the district court's reliance on that February 9th email in concluding that this was not a counteroffer at all. I believe it's the email to which Your Honor was just referring, which was, I think it was only one email, and that was Mr. Wolfer's email to Juan Carlos, which, and I think this is an important language in the email that hasn't been quoted yet. He says, notwithstanding the fact that Kennedy Funding is under no obligation to permit the borrower to pick and choose which properties to include in the collateral, we would accommodate your request, your request, to remove certain properties, and based on that, we would agree to lend $23 million secured by those five properties. I believe there was a suggestion that it was Kennedy Funding that went to Quinera and said, well, why don't you pick some different properties and we'll go about it this way. I disagree. I think the record indicates that Quinera was unhappy with the appraisal that CBRE came up with, and they said, look, we need to do something different. Would you consider, and the emails all have that same language, we would request, here's the email from February 6th from Mr. Cordova, Kevin, after carefully reviewing all the different considerations, we respectfully request the following considerations. Remove the following five, and he goes on to say that. That's not the language of someone who thinks that he's got the right to pick and choose the properties. He never wrote to Kennedy Funding to say, what are you talking about? I get to pick the properties, and you're compelled to lend 55% on those. That appears nowhere in the record. I hope I answered his questions. No further questions. Councilman, thanks for your brief and your argument. We'll take this into consideration. Could we just talk to you just for a minute over here?